UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANDREW D. NGUYEN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>MAXPOINT INTERACTIVE, INC., JOSEPH EPPERSON, BRAD SCHOMBER, KEVIN DULSKY, LYNNETTE FRANK, LEN JORDAN, AUGUSTUS TAI, GOLDMAN, SACHS & CO., DEUTSCHE BANK SECURITIES INC., PACIFIC CREST SECURITIES LLC, NEEDHAM & COMPANY, LLC and WILLIAM BLAIR & COMPANY, L.L.C.,<br><br>Defendants. | Civil Action No. 1:15-cv-06880-LTS<br><br>CLASS ACTION<br><br>FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br>DEMAND FOR JURY TRIAL |

Lead Plaintiff Phil Lifschitz ("Lead Plaintiff") alleges the following based upon the investigation of Lead Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by MaxPoint Interactive, Inc. ("MaxPoint" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1. This is a securities class action on behalf of all purchasers of the common stock of MaxPoint pursuant and/or traceable to the Registration Statement, as detailed herein, issued in connection with MaxPoint's March 6, 2015 initial public stock offering (the "IPO"), seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act").

2. MaxPoint provides a cloud-based marketing automation software platform that it claims helps companies digitally drive local, in-store sales of national brands by increasing in-store traffic. MaxPoint's primary product offering is "The MaxPoint Intelligence Platform" (the "MPIP"). MaxPoint claims that the MPIP matches the most likely communities of local buyers with a specific product at a particular retail location within a given time-frame, and then delivers digital marketing campaigns to reach those potential customers. It differentiates itself from other providers of online advertising by characterizing its MPIP offering as "hyperlocal advertising" that targets shoppers with ads and promotions in precisely defined neighborhoods. Working with leading national advertisers as its customers, MaxPoint claims to be able to deliver targeted ads and promotions at the most opportune moments.

3. In the Registration Statement used to conduct the IPO, and during the roadshow carried out by the underwriters, the Company and certain of its executives to market the IPO,

defendants repeatedly emphasized that at the time of the IPO, MaxPoint was then experiencing strong revenue growth due to the increased spending of its top customers, which MaxPoint referred to as "enterprise customers," and defined as customers generating north of $10,000 in sales per year. These claims of strong revenue growth were particularly material to would-be investors in MaxPoint common stock because the Company has never reported a profitable quarter and it expressly disclosed in the Registration Statement that it would not be paying a dividend to investors in the immediate future. Thus the only return on this investment would come from continued strong sales growth increasing the Company's stock price.

4. However, unbeknownst to investors, in reality at the time of its IPO, MaxPoint was heavily reliant upon a small number of customers – just 10% – for the lion's share of its revenues. Indeed, despite emphasizing throughout the Registration Statement that MaxPoint had ***479*** enterprise customers, in reality ***a full two-thirds of the Company's reported revenues*** had been derived from ***only 50*** of its most lucrative customers – relegating the remaining 429 enterprise customers to collectively providing just the remaining one-third of its revenues. As result, the Company was more heavily exposed to the spending whims of a very small number of those enterprise customers. The Registration Statement omitted this critical information in violation of Item 303 Regulation S-K [17 C.F.R. §229.303] ("Item 303"), which required the disclosure of this known uncertainty regarding the lack of diversification in MaxPoint's client base.

5. The omitted information was particularly material because by the time of MaxPoint's IPO – just weeks before the end of its first quarter 2015 (ending March 31, 2015) – rather than experiencing strong revenue growth, the Company was then experiencing a reduction in growth of revenue per enterprise customer because the new customers MaxPoint had been signing during the first half of 2015 were starting with smaller budgets and were generally smaller companies than

many of the larger enterprise customers MaxPoint had signed in prior years, resulting in lower trailing twelve-month average spending per customer growth. The Company's ability to increase its number of enterprise customers while continuing to grow its average revenue per customer was critical to MaxPoint's ultimate success, and Item 303 required disclosure of the known trend that growth in revenue per enterprise customer was declining in advance of the IPO.

6. Following the IPO, MaxPoint disclosed a more clear picture of its actual business metrics and financial prospects. As of the filing of this Amended Complaint, MaxPoint common stock is trading at approximately $1.50 per share, a decline ***more than 85%*** from the IPO price.

## JURISDICTION AND VENUE

7. The claims asserted herein arise under and pursuant to §§11, 12(a)(2) and 15 of the Securities Act [15 U.S.C. §§77k, 77l(a)(2) and 77o]. This Court has jurisdiction of this action pursuant to §22 of the Securities Act [15 U.S.C. §77v] and 28 U.S.C. §1331.

8. Venue is properly laid in this District pursuant to §22 of the Securities Act and 28 U.S.C. §1391(b) and (c). The acts and conduct complained of herein occurred in substantial part in this District as the two co-lead book-running managers of MaxPoint's IPO (identified below) maintain their principal places of business in this District where they acted as representatives of the other Underwriter Defendants in the IPO, conducting the IPO in and from this District, closing the IPO in this District, and MaxPoint common stock was listed on the New York Stock Exchange ("NYSE") in connection with the IPO.

9. In connection with the acts alleged in this Amended Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

10. Lead Plaintiff Phil Lifschitz purchased MaxPoint common stock pursuant and traceable to the IPO (as detailed in his certification filed herein on October 30, 2015, ECF No. 50-1), and was damaged thereby.

11. Defendant MaxPoint is a provider of technology-driven advertising services in the United States. MaxPoint was founded in September 2006 by Defendant Epperson (defined below), along with Chief Operating Officer Gretchen Joyce and Chief Technology Officer Kurt Carlson.

12. Defendant Joseph Epperson ("Epperson") is, and was at the time of the IPO, the President, Chief Executive Officer and a member and the Chairman of the MaxPoint Board of Directors.

13. Defendant Brad Schomber ("Schomber") is, and was at the time of the IPO, the Chief Financial Officer of MaxPoint.

14. Defendants Kevin Dulsky, Lynnette Frank, Len Jordan and Augustus Tai are, and were at the time of the IPO, directors of MaxPoint.

15. The defendants named in ¶¶12-14 are referred to herein as the "Individual Defendants." The Individual Defendants each signed the Registration Statement. The defendants named herein at ¶¶12-13 are also sometimes referred to herein as the "Executive Defendants." The Executive Defendants each personally participated in the roadshow used by the Underwriter Defendants to market the IPO.

16. Defendants Goldman, Sachs & Co. ("Goldman Sachs"), Deutsche Bank Securities Inc. ("Deutsche Bank"), Pacific Crest Securities LLC ("Pacific Crest"), Needham & Company, LLC ("Needham"), and William Blair & Company, L.L.C. ("William Blair"), are investment banking firms that acted as underwriters of MaxPoint's IPO, helping to draft and disseminate the offering documents (collectively, the "Underwriter Defendants"). Co-lead book-running managers of the

IPO, Goldman Sachs and Deutsche Bank, are both headquartered in this District. Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement as follows:

(a) The Underwriter Defendants are investment banking houses that specialize, *inter alia*, in underwriting public offerings of securities. They served as the underwriters of the IPO and shared more than $5.2 million in fees collectively. The Underwriter Defendants determined that in return for their share of the IPO proceeds, they were willing to merchandize MaxPoint stock in the IPO. The Underwriter Defendants arranged a multi-city roadshow prior to the IPO during which they, and representatives from MaxPoint, met with potential investors and presented highly favorable information about the Company, its operations, and its financial prospects;

(b) The Underwriter Defendants also demanded and obtained an agreement from MaxPoint that MaxPoint would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws. They also made certain that MaxPoint had purchased millions of dollars in directors' and officers' liability insurance;

(c) Representatives of the Underwriter Defendants also assisted MaxPoint and the Individual Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of MaxPoint, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning MaxPoint's operations and financial prospects;

(d) In addition to availing themselves of virtually unbridled access to internal corporate documents, agents of the Underwriter Defendants met with MaxPoint's lawyers,

management and top executives and engaged in "drafting sessions" between at least July 2014 and March 2015. During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which MaxPoint stock would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about MaxPoint would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and MaxPoint management and top executives, the Underwriter Defendants knew, or should have known, of MaxPoint's existing problems as detailed herein; and

(e) The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with offers and sales thereof, including to Lead Plaintiff and the Class.

17. The Underwriter Defendants together with the Individual Defendants are cited herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### The Company and the IPO

18. Defendant MaxPoint, which was founded in 2006, offers business intelligence and marketing automation software service designed to enable national brands to drive local, in-store sales.

19. The Company's customers consist primarily of national retail, consumer products, automotive, restaurant, healthcare, and entertainment brands that use its MPIP to predict the most likely local buyers of a specific product at a particular retail location and then execute cross-channel digital marketing campaigns to reach these buyers.

20. According to MaxPoint, by identifying and reaching only the most likely local buyers with digital customized product offers for local stores, national brands can more efficiently and effectively run local marketing campaigns, thereby increasing in-store sales and reducing wasted marketing spend associated with traditional approaches.

21. The Company focuses on national brands across a number of industries where transactions take place predominantly offline, such as consumer products, retail, automotive, healthcare, telecommunications and entertainment, and uses technological solutions to drive customers into those brick-and-mortar locations, replacing more outdated print media, direct mail and radio forms of advertising.

22. The MPIP is a cloud-based software service designed to enable national brands to predict local demand based on consumers' purchase power and intent and manage customized digital advertisements containing in-store offers and promotions to reach consumers at a local level across display, mobile, social and video channels.

23. The Company has built a proprietary Digital Zip architecture, a digital grid of households organized into over 44,000 specific neighborhoods, or Digital Zips, which can be as small as a couple of city blocks. Through a combination of proprietary and third-party data, MaxPoint creates a profile for each Digital Zip based on shared demographic and financial traits, such as family size, income level, education, age and historical purchasing behavior. The Company purportedly then uses its consumer purchase intent model to determine which products consumers in a particular Digital Zip are most likely to purchase.

24. The Company sells its advertising services solution both directly to customers and through advertising agencies. Customers typically pay on a cost per thousand impression, or "CPM," model based on the number of impressions delivered through the MPIP for each marketing

campaign. The Company defines "enterprise customers" as those customers who have spent more than $10,000 with it during a trailing twelve-month period, and also at the parent company level, so that one customer might have many brands.

25. On or about July 2, 2014, MaxPoint filed with the SEC a draft Registration Statement on Form S-1, which would later be utilized for the IPO following several amendments made in response to comments received from the SEC. On March 5, 2015, the SEC declared the Registration Statement effective. On or about March 6, 2015, MaxPoint and the Underwriter Defendants priced the IPO and filed the final Prospectus for the IPO, which forms part of the Registration Statement (collectively, the "Registration Statement").

26. The Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading and was not prepared in accordance with the rules and regulations governing its preparation.

**The Registration Statement Failed to Disclose Certain Trends and Uncertainties that Existed at the Time of the IPO**

27. At the time of the IPO, MaxPoint's business was experiencing negative trends and uncertainties that were likely to have a material impact on its continuing operations and future results. The Registration Statement was required to disclose these known trends and uncertainties, but did not.

28. Under instructions to Form S-1, MaxPoint was required to comply with Item 303 of Regulation S-K [17 C.F.R. §229.303]. Pursuant to Item 303 of Regulation S-K [17 C.F.R. §229.303], and the SEC's related interpretive releases thereto, including any known trends, issuers are required to disclose events or uncertainties that have had or are reasonably likely to cause the registrant's financial information not to be indicative of future operating results.

29. In 1989, the SEC issued an interpretive release on Item 303 and the disclosure required under the regulation. *See Management's Discussion and Analysis of Financial Condition and Results of Operations*, SEC Release No. 33-6835, 1989 SEC LEXIS 1011 (May 18, 1989) (hereinafter referred to as the "1989 Interpretive Release"). In the 1989 Interpretive Release, the SEC stated that:

> Required disclosure is based on currently known trends, events and uncertainties that are reasonably expected to have material effects, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.
>
> * * *
>
> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.[1]

*Id.* at *12-*13.

30. Furthermore, the 1989 Interpretive Release provided the following test to determine if disclosure under Item 303(a) is required:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
>
> (1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.
>
> (2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

*Id.* at *19.

---

[1] Unless otherwise noted, internal citations are omitted and emphasis is added throughout.

31. At the time of the IPO, MaxPoint's business was experiencing negative trends and uncertainties that were likely to materially impact its continuing operations and future results, as detailed below. The Registration Statement should have disclosed these trends and uncertainties, but did not.

32. ***Maxpoint Was Highly Exposed to a Small Number of Customers' Budgetary Proclivities Due To Inordinately High Customer Concentration***. At the time of its IPO, a full two-thirds of MaxPoint's revenues were being derived from just 50 of its top-spending customers. The remaining *429* purportedly high-spending "enterprise customers," whose importance the Company repeatedly emphasized in the Registration Statement, were collectively responsible for *just one-third* of the Company's revenues. Disclosure of this fact would have spelled out for potential investors in MaxPoint common stock that the Company was significantly exposed to the budgetary and spending proclivities of a small number – *roughly 10%* – of its enterprise customers and that there was very little diversification and protection from downturns in that 10%'s spending.

33. Indeed, with the Company having reported in its Registration Statement that $51.7 million – approximately 49% – of the $106.5 million in revenues the Company had taken in during FY 2014 (ended December 31, 2014) was derived from its top 25 customers, investors were entitled to know that another $19.3 million, or more than 17.6% of the Company's revenues, had been derived from the next 25 largest customers, relegating a mere one-third of the Company's remaining reported revenues – or approximately $35.5 million – to the remaining 429 enterprise customers.

34. While the Registration Statement highlighted that the average revenue received from MaxPoint's top 25 customers in 2014 was ***more than $2 million per year***, it failed to disclose the 429 enterprise customers that comprised the lower 90% of its customer base spent, on average, ***less than $83,000*** per year, while the second largest 25 customers spent, on average, approximately

***$772,000*** annually. The fact that MaxPoint was reliant upon just 50 customers – or 10% of its enterprise customers – for a full two-thirds of its revenues was material information that was required to be disclosed in the Registration Statement, but was not.

35. ***Maxpoint Had Been Signing Smaller Customers in the Months Leading Up to the IPO, Causing a Decline in its Trailing-Twelve-Month Average Customer Spending at the Time of the IPO***. The Registration Statement emphasized the significant growth in the number of enterprise customers, numbering them at 479 as of December 31, 2014. At the time of the IPO, however, MaxPoint had been signing smaller companies with materially smaller anticipated advertising budgets. As such, as the number of these new, less lucrative customers swelled, growth in the average revenue per customer – a metric MaxPoint consistently highlighted and investors heavily focused on – was declining on a trailing-twelve-month average basis. As a result, the Company experienced ***decreases*** in revenue per enterprise customer of 15% for the three months ended June 30, 2015 (compared to the three months ended June 30, 2014) and 13.6% for the three months ended September 30, 2015 (compared to the three months ended September 30, 2014).

36. At the time of the IPO, MaxPoint had been signing much smaller companies with much smaller advertising budgets. This trend – which exposed MaxPoint to declining revenue growth – was material information that was required to be disclosed in the Registration Statement, but was not.

**The Registration Statement Failed to Disclose Significant Risk Factors That Made the IPO More Speculative and Risky**

37. Item 3 of Form S-1 also required that the Registration Statement furnish the information called for under Item 503 of Regulation S-K [17 C.F.R. §229.503], including, among other things, a "discussion of the most significant factors that make the offering speculative or risky."

38. The risk disclosures in the Registration Statement negligently failed to advise investors about significant, then-existing (as opposed to potential) factors that made the IPO more speculative or risky than the Registration Statement disclosed.

39. First, the Registration Statement inaccurately described the ***potential*** risks associated with the failure to sign new customers or a reduction in sales from existing customers, which "could" cause a decrease in MaxPoint's revenue growth and a corresponding increase in its net losses. The Registration Statement stated, in pertinent part, as follows:

> **If we are unable to attract new customers or our existing customers do not allocate a greater portion of their marketing spend to us, our revenue growth will be adversely affected.**
>
> To sustain or increase our revenue, we must add new customers and encourage existing customers to allocate a greater portion of their marketing spend to us. As the digital advertising industry matures and competitors introduce lower cost or differentiated products or services, our ability to sell our solution could be impaired. Even after a successful digital marketing campaign or series of campaigns with an existing customer, we frequently must compete to win further business from that customer. We may reach a point of saturation where we cannot continue to grow our revenue from existing customers because of, among other things, internal limits that they may place on their advertising budgets for digital media, particular digital marketing campaigns, local advertising or a particular provider. ***If we are unable to attract new customers or obtain new business from existing customers, our revenue, growth and business will be adversely affected.***

40. The statements above were inaccurate statements of material fact because while noting the ***potential*** negative impacts on revenues of failing to sign new customers or increase sales to existing customers, the Registration Statement failed to disclose the significant, then-existing risk that MaxPoint ***had already been*** signing as new customers smaller companies with smaller advertising budgets, which were ***already reducing*** the growth in its average revenue per customer on a trailing-twelve-month average. As noted below, Defendant Schomber has expressly acknowledged the existence of this previously undisclosed significant risk at the time of the IPO when he stated in May 2015 that in the 1Q 2015, MaxPoint had been "experiencing faster growth in the number of

new customers [it was] on-boarding ***with initial spend levels below the average***." Defendant Schomber further stated that day that the decline in spending by these new customers was no surprise to the Company, stating in pertinent part that MaxPoint had "a very strong understanding of [its] customer base, [its] new customer adds that [it had] added over the past few quarters, how they [were] adopting on [its] adoption scale, how they [were] running on [its] adoption scale, as well as [its] pipeline."

41. Likewise, the Registration Statement inaccurately characterized as a mere ***potential*** risk customer concentration, stating in pertinent part, as follows:

> **We have historically relied, and expect to continue to rely, on a small number of customers for a substantial majority of our revenue, and the loss of any of these customers may significantly harm our business, results of operations and financial condition**.
>
> Our customers are primarily enterprises with national brands in a number of industries. We sell our solution either directly to our customers or through advertising agencies that act on behalf of our customers. A relatively small number of customers have historically accounted for a substantial majority of our revenue. For the years ended December 31, 2012, 2013 and 2014, our top ten customers accounted for approximately 32%, 36% and 30% of our revenue, respectively. ***For the years ended December 31, 2012, 2013 and 2014, no single customer represented more than 10% of our revenue.*** We expect that we will continue to depend upon a relatively small number of customers for a substantial majority of our revenue for the foreseeable future while we continue to broaden our customer base. ***As a result, if we fail to successfully attract or retain customers, or if existing customers reduce or delay their marketing spend with us, our business, results of operations and financial condition would be harmed.*** Moreover, a significant portion of our customers' products are purchased at a limited number of large national retailers. Any material decline in these customers' sales at the physical retail locations of these large national retailers may adversely impact our business.

42. The statements above were inaccurate statements of material fact because the Registration Statement once again highlighted as a mere ***potential*** risk that the Company might fail to sign new customers or to increase sales from existing customers while failing to disclose that MaxPoint had ***already been*** signing new customers that were smaller companies with smaller advertising budgets, which was ***already*** reducing growth in its average revenue per enterprise

customers on a trailing-twelve-month basis. More importantly, while noting that the Company's top ten customers had traditionally provided one-third of the Company's revenues, the purported customer concentration risk disclosure actually understated the risk by: (i) emphasizing that no single customer represented more than 10% of the Company's revenues; and (ii) failing to disclose that ***a full two-thirds*** of the Company's revenues were coming from just its top 50 customers, rendering misleading the Registration Statement's claims that certain "enterprise customers" were spending, on average, more than $2 million dollars per year materially false and misleading in light of the fact that, ***on average***, 429 of the Company's 479 enterprise customers – or ***90%*** – were spending ***less than $83,000*** per year.

43. The statements in ¶¶39 and 41 above were each inaccurate statements of material fact because the Registration Statement negligently failed to disclose the significant then-existing (as opposed to potential) risks associated with having recently signed enterprise customers with smaller businesses and smaller advertising budgets and the Company's significant customer concentration.

**The Registration Statement Contained Inaccurate Statements of Material Fact**

44. Concerning the sales growth MaxPoint was experiencing at the time of its IPO, the Registration Statement stated, in pertinent part, as follows:

> We generated revenue of $35.1 million, $66.1 million and $106.5 million for the years ended December 31, 2012, 2013 and 2014, respectively, ***representing year-over-year increases of 88% and 61%***, respectively. Revenue less traffic acquisition costs, which we refer to as Revenue ex-TAC, was $18.6 million, $38.4 million and $61.9 million for the years ended December 31, 2012, 2013 and 2014, respectively, ***representing year-over-year increases of 106% and 61%***, respectively.

45. In addition to emphasizing that MaxPoint's revenues had significantly increased during the past two years, the Registration Statement further stated that the Company's revenues for the first nine months of 2014 ***alone*** were $67.9 million, ***more than all of 2013's revenues***, and that revenues for the fourth quarter 2014 (ended December 31, 2014) had continued growing to $38.6

million, ***an increase of more than 73%*** of the average revenues reported for each of the first three quarters of 2014, and a ***59% increase*** over its 4Q 2013 revenues.

46. The Registration Statement stated that the number of "enterprise customers," those responsible for $10,000 or more in revenues during any trailing twelve month period, had mushroomed from just 225 in 2012, to 304 in 2013, all the way up 479 in 2014, emphasizing that "[a]s of December 31, 2012, 2013 and 2014, customers from which we have generated less than $10,000 of revenue during the previous trailing twelve-month period have accounted for less than 2% of our revenue." The Registration Statement also expressly emphasized the significant contribution of each of its 479 enterprise customers, stating that MaxPoint's "ability to generate additional revenue from [its] enterprise customers ***[was] an important indicator of [its] ability to grow revenue over time***."

47. Elsewhere, the Registration Statement emphasized that "[a]s an additional example of the growth of acceptance of [its] solution, [MaxPoint's] engagement with [its] top 25 customers," the average revenue from its top 25 customers had more than quadrupled over the prior four year period, growing from $440,000 in 2011, to $757,000 in 2012, to $1.474 million in 2013, to $2.068 million in 2014. Meanwhile, the Registration Statement highlighted that the "[m]inimum revenue [reported] from [MaxPoint's] top 25 customers" increased more than eight-fold from $119,000 in 2011, to $362,000 in 2012, to $682,000 in 2013, to $1.035 million in 2014.

48. The Registration Statement represented that the Company "analyze[d] the median annual revenue from" its top 25 customers, broken down by the first year they became customers, emphasizing, for instance, that median spending from the "Class of 2011" had increased from $223,000 in 2011 to $419,000 in 2012 to $712,000 in 2013 to $1,011,000 in 2014. The significance of this increase in median customer revenue spending by the Company's top 25 customers was

emphasized by Underwriter Defendants Deutsche Bank and William Blair in their March 2015 initiation reports, with the firms indicating ***it demonstrated steady, ongoing, strong sales growth***:

Figure 16: Top 25 customers steadily growing their spend with MaxPoint




Source: Company reports, Deutsche Bank

MaxPoint Interactive, Inc.
Median Revenue by Top 25 Customers From Each Class
(dollars in thousands)




Sources: MaxPoint Interactive, Inc. and William Blair & Company, L.L.C.

Based on that trajectory, for 2015 Underwriter Defendant William Blair was "estimat[ing] that revenue [would] increase to $152.0 million in 2015, up 42.8% year-over-year," with that "revenue estimate [being] driven by an 18.4% year-over-year increase in enterprise customers (to 567 at year-

end) and a 6.9% year-over-year increase in average spending per customer, to $291,000." For 2016, Underwriter Defendant William Blair was "estimat[ing] that revenue [would] increase to $210.9 million in 2016, up 38.7% year-over-year," with that "revenue estimate [being] driven by a 14.5% year-over-year increase in enterprise customers (to 649 at year-end) and a 19.3% year-over-year increase in average spending per customer, to $347,000." Underwriter Defendant Deutsche Bank published similar revenue estimates of $154.5 million and $213.5 million in fiscal years 2015 and 2016, respectively, based on that strong trajectory as well.

49. Expressly downplaying the significance of MaxPoint's customer concentration, the Registration Statement emphasized that the "[p]ercent of total revenue from top 25 customers" had actually declined from 75% in fiscal 2011, down to 54% in fiscal 2012, up to 56% in 2013, and had declined down to 49% by the end of 2014. Customer concentration was particularly material to investors in light of the fact that the Company's customer agreements typically have terms of less than three months and are cancellable at any time, rendering the Company particularly exposed to the whims of its customers. Under these circumstances, having revenues spread out over ***479*** enterprise customers purportedly provided customer diversification and protection from the budgetary and other whims of a small number of customers.

50. The statements referenced above in ¶¶44-49 were each inaccurate statements of material fact because they failed to disclose the following material facts which existed at the time of the IPO:

(a) MaxPoint was wholly dependent upon its top 50 customers ***alone*** for ***two-thirds of its sales revenues*** and, as a result, the Company was more exposed to the budgetary constraints, promotional activities, and spending priorities of merely 50 customers, and did not have the diversification that the Registration Statement reflected; and

(b) the new customers MaxPoint was signing in the first half of 2015 were starting with smaller budgets and were generally smaller companies than many of the enterprise customers then using the MPIP, who had been signed prior to the IPO, resulting in lower trailing twelve-month average spending per customer growth.

51. The IPO was successful for the Company and the Underwriter Defendants, who sold 6.5 million shares of MaxPoint common stock to the public at $11.50 per share, raising $74.75 million in gross proceeds for the Company ($69.5 million in net proceeds from the IPO after deducting underwriting discounts, commissions and offering costs).

52. However, when Underwriter Defendant Goldman Sachs issued its initial report on MaxPoint merely weeks following its IPO on March 31, 2015, the last day of the Company's 1Q 2015, the firm assigned a target price of only $11 per share and a stock rating of "Neutral," rather than "Buy". On the date of report, the price of the MaxPoint common stock closed at $9.58 per share.

53. When MaxPoint reported its 1Q 2015 financial results (ended March 31, 2015) after the close of trading on May 13, 2015, Defendant Schomber stated that the Company's trailing-twelve-month average of revenues for customers had only "increased at a low-single-digit rate year-over-year in the first quarter," disclosing that MaxPoint was "experiencing faster growth in the number of new customers [it was] on-boarding ***with initial spend levels below the average***." Defendant Schomber admitted that the decline in spending by the new customers was no surprise to MaxPoint, stating in pertinent part that MaxPoint had "a very strong understanding of [its] customer base, [its] new customer adds that [it had] added over the past few quarters, how they [were] adopting on [its] adoption scale, how they[ were] running on [its] adoption scale, as well as [its]

pipeline." As a result, however, MaxPoint reported a net loss of $8.1 million for the 1Q 2015, almost double the net loss of $4.2 million reported for the 1Q 2014.

54. On this news, despite having reported year-over-year revenue growth and providing 2Q 2015 and FY 2015 financial projections above that which the market had anticipated, the price of MaxPoint common stock, which had already declined from its IPO price of $11.50 to close at $8.46 per share on May 13th, further declined to close at $8.29 per share on May 14th on unusually high trading volume. Underwriter Defendant Deutsche Bank remarked in its client note that MaxPoint's "[r]evenue per customer continue[d] to grow in low single digits ***due to lower than average spend by newly added customers***," leaving its prior $13 price target in place despite the increased revenues reported.

55. On August 12, 2015, after the close of trading, the Company reported its financial results for its 2Q 2015 (ended June 30, 2015). MaxPoint finally disclosed that ***a full two-thirds of its revenue was derived from just 50 of its customers***, rendering the Company particularly exposed to the budgetary and other spending whims of those customers. During the conference call that the Company held with investors later that evening, Defendant Schomber further stated that while revenues had again nominally increased year-over-year during the quarter, revenue growth had significantly declined, stating that "the magnitude of the decrease was the largest [MaxPoint had ever] experienced." While acknowledging that some customers had simply cancelled their planned spending in the 2Q 2015, Defendant Schomber claimed that another more than $2 million in gross revenue that had been booked for the 2Q 2015 had been pushed off by customers to the second half of FY 2015, representing that those customer spending declines were "due to budgetary reasons and the timing or their internal timing." The Company also lowered its FY 2015 revenue guidance.

56. Responding to an analyst pointing out that MaxPoint was "at the lower end of [its 2Q 2015] guidance despite adding so many customers" during the first half of the year, and querying whether those new customers were "smaller, so maybe they're not spending as much?," Defendant Schomber disclosed that many of the new enterprise customers the Company had been signing during the first half of 2015 were "going to generally start with smaller spend levels" and "probably [did] not [have same] the revenue potential" as the "largest enterprise customers that [MaxPoint] already ha[d]." The quarterly financial report the Company filed on Form 10-Q with the SEC on August 13th disclosed an actual "***decrease*** in . . . revenue per enterprise customer of ***15.0%*** for the three months ended June 30, 2015, as compared to the three months ended June 30, 2014."

57. On this news, the price of MaxPoint common stock declined more than 30% on August 13th, closing down $2.77 per share at $6.13 per share, on unusually high trading volume of approximately ten times the average daily trading volume over the preceding ten trading days. Underwriter Defendant Deutsche Bank called it an "implosion."

58. Underwriter Defendant William Blair's August 13th client note now noted that the Company's 2Q 2015 revenues were "at the low end of the company's guidance range and below the consensus estimate of $22.2 million," that its 3Q 2015 revenue guidance was "below the consensus expectation of $23.2 million," and emphasized that the 2Q 2015 "[trailing-twelve-month] average spending per customer ***only increased 1% year-over-year*** ([significantly] lower than [the firm's] model of 12%), . . . ***due to the new customers added starting with smaller budgets and generally being smaller companies than many of the enterprise customers currently using MaxPoint's platform***." As a result, the firm "decreased [its] 2015 revenue excluding TAC estimate to $89.6 million from $92.3 million and increased [its] 2015 adjusted loss before interest, taxes, depreciation, and amortization to $10.4 million from a loss of $15.1 million."

59. Underwriter Defendant Deutsche Bank's client note, issued a few days later on August 27th entitled "Post 2Q15 Damage Control Mode," was even more critical, lamenting that the Company's "2Q15 earnings re-emerged many of [that firm's] fears around investing in small cap ad tech," that "***Maxpoint's implosion seem[ed] warranted given missing its first 'real' print post IPO,***" and that the firm "expect[ed] shares to remain in the penalty box for the foreseeable future." Critically, Deutsche Bank noted that "[t]he biggest negative [was its own] reduced confidence in management to forecast its own business in its first quarter post IPO," pointing out that while "[t]he miss was characterized as a 'push out' of a few key CPG campaigns, . . . ***the lowering of the FY guidance suggests its just lost revenue from cancellations***." As a result, that firm "lowered [its] FY16 net revenue estimate lower by 16%" and slashed its price target from $13 to $8 per share, lamenting that "[r]isks [now] include low revenue visibility."

60. Finally, on November 12, 2015, the Company issued a release announcing its 3Q 2015 results (for the quarter ended September 30, 2015) after the close of trading. Again blaming what it characterized as "softness in both [its] booked and prospective business," MaxPoint conceded that much of the $2 million in revenue purportedly delayed by customers from the 2Q 2015 to second half of FY 2015 would not be coming in, instead projecting that the Company's adjusted revenue in the 4Q 2015 would only range between $20 million and $24 million, well below the $29.8 million the investment community had been led to expect. Underwriter Defendant Deutsche Bank analyst Ross Sander emphasized during the securities analyst and investor conference call held that evening that the Company's guidance of $20 million to $24 million in adjusted revenue in the 4Q 2015 marked "zero growth" compared to 3Q 2015 revenue of $23 million. The Company also reduced its guidance for FY 2015 revenue to between $81.1 million and $85.1 million, down significantly from its own prior guidance range of $86.7 million to $93.2

million, and confirmed that its net loss would grow as a result. During the conference call, Defendant Schomber blamed the decline on certain customers "cancelling" and reducing their promotional spending "for budgetary and other internal reasons." The quarterly financial report the Company filed on Form 10-Q with the SEC on November 13th disclosed an actual "***decrease*** in . . . revenue per enterprise customer ***of 13.6%*** for the three months ended September 30, 2015, as compared to the three months ended September 30, 2014."

61. On this news, the price of MaxPoint common stock plummeted another ***56%*** – or $2.77 per share – to close at $2.20 per share on November 13th, this time on unusually high trading volume of more than ***46 times*** the average daily trading volume over the preceding ten trading days.

62. Underwriter Defendant Needham downgraded its rating on MaxPoint common stock from a "buy" to a "hold" on November 13th, lamenting that Company's "inability to pinpoint the root cause of the reduced spending (forecast for the fourth quarter) highlight[ed] the limited visibility into 4Q15 and 2016."

63. Underwriter Defendant William Blair's client note emphasized that the firm had "***clearly been wrong on MaxPoint shares to date***," now critically warning that "[g]iven the significant reduction in fourth-quarter guidance and uncertainty surrounding the future growth trajectory of the business, [the firm had] decreased [its own] 2016 estimates significantly," with "2016 revenue, excluding TAC, estimate decreas[ing by 25%] to $92.1 million, from $122.6 million previously" and "2016 adjusted loss before interest, taxes, depreciation, and amortization [increasing by 109%] to $20.1 million, from a loss of $9.6 million previously." The firm's report further lamented that 3Q 2015 "[trailing-twelve-month] average spending per customer decreased 3.8% year-over-year (lower than [its] model of 1.7%) . . . ***due to the new customers added starting with smaller budgets and generally being smaller companies than many of the enterprise customers***

***currently using MaxPoint's platform***"; and noting that "[i]n 2016, [the firm's] model assume[d] that the average spending per customer ***[would] continue to decline***."

64. Likewise, Underwriter Defendant Deutsche Bank further reduced its 2015 and 2016 revenue estimates, and reduced its MaxPoint price target by 25% down to $6 per share in its own November 13th report entitled "More Questions Than Answers - ***Another Ad Tech Implosion***." The firm's report went on to emphasize in pertinent part as follows:

> Maxpoint lowered business outlook for two quarters straight now, which points to the risk associated with limited revenue visibility in its business model (or any in ad tech). ***The company lowered 4Q15 revenue guidance by ~25% at midpoint to $22m (vs. $30m implied previously), or +2% y/y growth, a sharp deceleration from +90% growth in 1Q15***. MXPT once again noted weakness in CPG and auto verticals due to lower budgets allocated for promotional spend but believes the campaign ROI still remains healthy. Salesforce productivity (est by rev per S&M headcount) was down once again in 3Q by 2% but likely to be materially worse in 4Q. Finally, Maxpoint didn't provide any guidance for FY16 ***but we are currently modeling very little revenue growth***.

65. Underwriter Defendant Deutsche Bank further lamented in its report that because "[t]he $2 in cash per share ($48m)" remaining on the Company's books from the IPO proceeds "look[ed] vulnerable considering the $13m of CFO burn and the $15m of capex and capitalized software development," "***Maxpoint appear[ed] to be in serious trouble . . . .***"

66. As of the filing of this First Amended Complaint, the stock is trading at approximately $1.50 per share, ***85% less than the IPO price of $11.50***, rendering MaxPoint's IPO, according to *Renaissance Capital*, "***the biggest IPO flop of 2015***."

## CLASS ACTION ALLEGATIONS

67. Lead Plaintiff brings this action as a class action on behalf of a class consisting of all those who purchased MaxPoint common stock pursuant and/or traceable to the Registration Statement issued in connection with the IPO (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors and affiliates of Defendants, at all relevant times,

members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

68. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by MaxPoint or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

69. Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

70. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

71. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants violated the Securities Act;

(b) whether the Registration Statement was negligently prepared and contained inaccurate statements of material fact and omitted material information required to be stated therein; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

72. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**COUNT I**

**For Violation of §11 of the Securities Act**
**Against All Defendants**

73. Lead Plaintiff incorporates ¶¶1-72 by reference.

74. This Cause of Action is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

75. The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

76. Defendants are strictly liable to Lead Plaintiff and the Class for the misstatements and omissions.

77. None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

78. By reason of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated, §11 of the Securities Act.

79. Lead Plaintiff acquired MaxPoint common stock traceable to the IPO.

80. Lead Plaintiff and the Class have sustained damages. The value of MaxPoint common stock has declined substantially subsequent to and due to Defendants' violations.

81. At the time of their purchases of MaxPoint common stock, Lead Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year has elapsed from the time that Lead Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Lead Plaintiff commenced this action. Less than three years has elapsed between the time that the securities upon which this Cause of Action is brought were offered to the public and the time Lead Plaintiff commenced this action.

## COUNT II

### For Violation of §12(a)(2) of the Securities Act Against Defendant MaxPoint, the Executive Defendants and the Underwriter Defendants

82. Plaintiff incorporates ¶¶1-81 by reference.

83. By means of the defective Prospectus, Defendant MaxPoint, the Executive Defendants and the Underwriter Defendants promoted and sold MaxPoint stock to Plaintiff and other members of the Class.

84. The Prospectus and statements made at and slides presented in connection with the roadshow used to market the IPO contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above. The defendants named in this Count owed Plaintiff and the other members of the Class who purchased MaxPoint common stock pursuant to the Prospectus and representations at the roadshow the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus and at the roadshow to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. These defendants, in the exercise of

reasonable care, should have known of the misstatements and omissions contained in the Prospectus as set forth above.

85. Plaintiff did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectus at the time he acquired MaxPoint common stock from an Underwriter Defendant pursuant to the IPO or in the aftermarket following the IPO.

86. By reason of the conduct alleged herein, the defendants named in this Count violated §12(a)(2) of the Securities Act. As a direct and proximate result of such violations, Plaintiff and the other members of the Class who purchased MaxPoint common stock pursuant to the Prospectus sustained substantial damages in connection with their purchases of the stock. Accordingly, Plaintiff and the other members of the Class who hold the common stock issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their common stock to the defendants sued herein. Class members who have sold their common stock seek damages to the extent permitted by law.

## COUNT III

### For Violation of §15 of the Securities Act
### Against the Company and the Individual Defendants

87. Lead Plaintiff incorporates ¶¶1-86 by reference.

88. This Cause of Action is brought pursuant to §15 of the Securities Act against the Company and the Individual Defendants.

89. The Individual Defendants each were control persons of MaxPoint by virtue of their positions as directors and/or senior officers of MaxPoint. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of MaxPoint. The Company controlled the Individual Defendants and all of MaxPoint's employees.

90. The Individual Defendants each were culpable participants in the violations of §11 of the Securities Act alleged in the Cause of Action above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

**PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action, certifying Lead Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and certifying Lead Counsel as Class Counsel;

B. Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding rescission or a rescissory measure of damages;

D. Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E. Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

**JURY TRIAL DEMANDED**

Lead Plaintiff hereby demands a trial by jury.

DATED: January 19, 2016

ROBBINS GELLER RUDMAN
& DOWD LLP
SAMUEL H. RUDMAN
MARY K. BLASY

*/s/ Samuel H. Rudman*

SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
mbalsy@rgrdlaw.com

WEISSLAW LLP
JOSEPH H. WEISS
JOSHUA M. RUBIN
1500 Broadway, Suite 1600
New York, NY 10036
Telephone: 212/682-3025
212/682-3010 (fax)
jweiss@weisslawllp.com
jrubin@weisslawllp.com

*Lead Counsel for Plaintiff*

HOLZER & HOLZER, LLC
COREY D. HOLZER
MARSHALL DEES
1200 Ashford Parkway, Suite 410
Atlanta, Georgia 30338
Telephone: 770/392-0090
770/392-0029 (fax)
cholzer@holzerlaw.com
mdees@holzerlaw.com

*Additional Counsel for Plaintiff*