UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x

ANDREW D. NGUYEN, Individually and
on Behalf of All Others Similarly Situated,

        Plaintiff,

   -v-                                 No.  15CV6880-LTS

MAXPOINT INTERACTIVE, INC. et al.,

        Defendants.

---------------------------------------------------------x

MEMORANDUM OPINION AND ORDER

        MaxPoint Interactive, Inc. ("MaxPoint," or the "Company") made an initial

public offering of common stock in March 2015.  In this putative class lawsuit brought against

MaxPoint, several of its executive officers and directors (the "Individual Defendants," together

with MaxPoint, "Company Defendants"), and underwriters (the "Underwriter Defendants,"

together with Company Defendants, "Defendants"), Lead Plaintiff Phil Lifschitz ("Plaintiff"),

alleging that MaxPoint's Registration Statement omitted material information, asserts a claim

under Section 11 of the Securities Act, 15 U.S.C. §77k, against all Defendants; a claim under

Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), against MaxPoint, certain of the

Individual Defendants, and the Underwriter Defendants; and a claim under Section 15 of the

Securities Act, 15 U.S.C. §77o, against MaxPoint and the Individual Defendants.  The Court has

jurisdiction of this action pursuant to 28 U.S.C. § 1331.

        MaxPoint, the Individual Defendants and, separately, the Underwriter

Defendants, have moved to dismiss the First Amended Complaint ("FAC").  The Court has

reviewed all of the parties' submissions carefully.  For the following reasons, the motions to dismiss the FAC are granted.

## BACKGROUND

Unless otherwise noted, the following facts are taken from the FAC and are assumed to be true for the purposes of this motion practice.

MaxPoint, founded in 2006, offers business intelligence and marketing automation software service designed to enable national brands to drive local, in-store sales. (FAC ¶ 18.)  The Company's customers consist primarily of national retail, consumer products, automotive, restaurant, healthcare, and entertainment brands that use its software platform to predict the most likely local buyers of a specific product at a particular retail location and then execute cross-channel digital marketing campaigns to reach these buyers.  (Id. ¶ 19.)  MaxPoint sells its advertising services solution directly to customers and through advertising agencies.  (Id. ¶ 24.)   The Company defines "enterprise customers" as those customers who have spent more than $10,000 with it during a trailing twelve-month period.  (See id.)

On or about July 2, 2014, MaxPoint filed with the SEC a draft Registration Statement on Form S-1, which would later be utilized for the IPO following several amendments made in response to comments received from the SEC.  (Id. ¶ 25.)  On March 5, 2015, the SEC declared the Registration Statement effective.  (Id.)  On or about March 6, 2015, MaxPoint and the Underwriter Defendants priced the IPO and filed the final Prospectus for the IPO, which forms part of the Registration Statement (including the Prospectus, the "Registration Statement" or "Reg. St.").

The Registration Statement on page 6, under the subheading "Risks Related to

Our Business," stated, <u>inter</u> <u>alia</u>:

- If we are unable to attract new customers or our existing customers do not allocate a greater portion of their marketing spend to us, our revenue growth will be adversely affected.

- We have historically relied, and expect to continue to rely, on a small number of customers for a significant portion of our revenue, and the loss of any of these customers may significantly harm our business, results of operations and financial condition.

The Registration Statement, beginning on Page 13, under the heading "Risk

Factors" and subheading "Risks Related to Our Business and Industry," further stated, <u>inter</u> <u>alia</u>:

**Our limited operating history makes it difficult to evaluate our business and prospects and may increase the risks associated with your investment.**

We commenced operations in 2006 and, as a result, have only a limited operating history upon which our business and future prospects may be evaluated. Although we have experienced substantial revenue growth in recent years, we may not be able to sustain this rate of growth or even maintain our current revenue levels. We have encountered and will continue to encounter risks and difficulties frequently experienced by growing companies in rapidly developing and changing industries.

. . .

**We have a history of losses, we expect our operating expenses to continue to increase substantially and we may not achieve or sustain profitability in the future.**

We incurred net losses of $6.8 million, $0.2 million and $13.0 million in 2012, 2013, and 2014, respectively. As of December 3, 2014, we had an accumulated deficit of $28.8 million. Although our revenue has increased significantly in recent periods, we may not be able to achieve or sustain profitability or this revenue growth rate.

. . .

**We have historically relied, and expect to continue to rely, on a small number of customers for a substantial majority of our revenue, and the loss of any of these customers may significantly harm our business, results of operations and financial conditions.**

> Our customers are primarily enterprises with national brands in a number of industries. We sell our solution either directly to our customers or through advertising agencies that act on behalf of our customers. A relatively small number of customers have historically accounted for a substantial majority of our revenue. For the years ended December 31, 2012, 2013 and 2014, our top ten customers accounted for approximately 32%, 36% and 30% of our revenue, respectively. For the years ended December 31, 2012, 2013 and 2014, no single customer represented more than 10% of our revenue. We expect that we will continue to depend upon a relatively small number of customers for a substantial majority of our revenue for the foreseeable future while we continue to broaden our customer base. As a result, if we fail to successfully attract or retain customers, or if existing customers reduce or delay their marketing spend with us, our business, results of operations and financial condition would be harmed. Moreover, a significant portion of our customers' products are purchased at a limited number of large national retailers. Any material decline in these customers' sales at the physical retail locations of these large national retailers may adversely impact our business.

(Reg St. at 6, 13-16 (emphasis in original.))  The Registration Statement also included a chart that indicated the percentage of total revenue attributable to the top 25 customers for the years 2011 to 2014, disclosing, for instance, that the top 25 customers accounted for 49 percent of revenues in 2014.  (Id. at 54.)  The Registration Statement further disclosed that the Company had a total of 479 enterprise customers as of December 31, 2014. (Id. at 85.)

MaxPoint disclosed the financial results for its 1Q2015 (the period January 1, 2015, to March 31, 2015) on May 13, 2015.  (Id. ¶¶ 5, 52-53.)  At that time, Individual Defendant Brad Schomber, MaxPoint's Chief Financial Officer, stated that the Company's trailing twelve month average of revenues for customers "increased at low-single-digit rate year-over-year in the first quarter," also disclosing that MaxPoint was "experiencing faster growth in the number of new customers [it was] on-boarding with initial spend levels below the average." (Id. ¶ 53.)  Plaintiff alleges that, as a result of a trend of lower spending by new customers in 2015, the Company experienced decreases in revenue per enterprise customer of 15 percent for

the three months ended September 30, 2015.  (Id. ¶ 35.)  Plaintiff alleges that, "[a]t the time of

the IPO, MaxPoint had been signing much smaller companies with much smaller advertising

budgets.  This trend - which exposed MaxPoint to declining revenue growth - was material

information that was required to be disclosed in the Registration Statement."  (Id. ¶ 36.)

MaxPoint reported a net loss of $8.1 million for 1Q2015; it had reported a net loss of $4.2

million for 1Q2014.  (Id.)

       Plaintiff alleges that the Registration Statement, including the Prospectus, was

inaccurate, misleading and contained material omissions, in violation of Sections 11 and 12(a)(2)

of the Securities Act.  (Id. ¶¶ 75, 84.)  Further, Plaintiff alleges that the Company and the

Individual Defendants, as control persons of MaxPoint, violated Section 15 of the Securities Act.

(Id. ¶ 89.)  In support of these claims, Plaintiff principally alleges that MaxPoint did not

adequately disclose, at the time of its IPO, that it was heavily reliant on a small number of

customers (see id. ¶ 4) and the "known trend that growth in revenue per enterprise customer was

declining in advance of the IPO" (id. ¶ 5.)  More specifically, Plaintiff alleges that MaxPoint, at

the time of its IPO, was heavily reliant upon 10 percent of its customers (specifically, its top 50

customers) for two-thirds of MaxPoint's reported revenues and failed to disclose that metric.

(Id. ¶¶ 4, 50.)  As a result of the concentration of revenues in this small group, Plaintiff alleges

"the Company was more heavily exposed to the spending whims of a very small number of its

479 enterprise customers."  (See id.)  Plaintiff further alleges that the omitted information

regarding "the lack of diversification in MaxPoint's client base" was "particularly material

because by the time of MaxPoint's IPO - just weeks before the end of its first quarter 2015

(ending March 31, 2015) - rather than experiencing strong revenue growth, the Company was

then experiencing a reduction in growth of revenue per enterprise customer because the new

customers MaxPoint had been signing during the first half of 2015 were starting with small

budgets and were generally smaller companies than many of the larger enterprise customers

MaxPoint had signed in prior years, resulting in lower trailing twelve-month average spending

per customer growth."  (Id. ¶ 5.)  Plaintiff alleges that Item 303 of Regulation S-K, 17 C.F.R.

§229.303 ("Item 303") required disclosure of the "known trend that growth in revenue per

enterprise customer was declining in advance of the IPO."  (Id.)  Instead of making such

disclosures, Plaintiff asserts, the Registration Statement and marketing of the IPO by the

Defendants "repeatedly emphasized that at the time of the IPO, MaxPoint was then experiencing

strong revenue growth due to the increased spending of its top customers."  (Id. ¶ 3.)

<u>DISCUSSION</u>

A.          <u>Pleading Standard</u>

          As an initial matter, the parties dispute whether Rule 8 or Rule 9(b) of the Federal

Rules of Civil Procedure governs the pleading of the Securities Act claims in this case.  Rule

9(b) requires a party "to state with particularity the circumstances constituting fraud or mistake,"

whereas Rule 8 requires only "a short and plain statement of the claim showing that the pleader

is entitled to relief."  Fed. R. Civ. P. 8, 9.

          To establish a prima facie claim under Section 11, "'[a] plaintiff need only plead

a material misstatement or omission in the registration statement.'"  <u>City of Roseville Emps.'</u>

<u>Ret. Sys. v. EnergySolutions, Inc.</u>, 814 F. Supp. 2d 395, 424 (S.D.N.Y. 2011).  The Second

Circuit in <u>Rombach v. Chang</u> held that "while a plaintiff need allege no more than negligence to

proceed under Section 11 and Section 12(a)(2), claims that do rely upon averments of fraud are

subject to the test of Rule 9(b)."  355 F.3d 164, 171 (2d Cir. 2004).  Where the complaint does

not allege that the defendants "affirmatively knew [of the omitted fact] and chose to conceal it" and asserts only that such information was available to the defendants, Rule 8 applies.  See McKenna v. Smart Techs. Inc., 11 CV 7673, 2012 U.S. Dist. LEXIS 118312, at *12 (S.D.N.Y. Aug. 21, 2012); see also In re TVIX Sec. Litig., 25 F. Supp. 444, 449 (S.D.N.Y. 2014) ("Where, as here, Section 11 claims sound in negligence rather than in fraud, Plaintiff's pleading must satisfy the basic requirements of Rule 8(a)(2) of the Federal Rules of Civil Procedure, rather than the heightened standard set by Rule 9(b).")

The FAC does not sound in fraud requiring evaluation of the claims under Rule 9(b).  The FAC does not allege that MaxPoint affirmatively chose to conceal the omitted facts at issue, but rather alleges that the Registration Statement was "negligently prepared, and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements not misleading . . . ."  (FAC ¶ 26.)  The FAC alleges in many instances that the disclosures should have been made, but were not and that the Defendants "knew or should have known" the omitted information.  (See id. e.g., ¶¶ 16, 31, 36, 84.)  The mere fact that the FAC alleges that there were inaccurate and misleading statements in the Registration Statement, which are required elements for pleading any Section 11 claim, does not transform the claims into fraud claims subject to the heightened pleading standard under Rule 9(b).  Accordingly, Plaintiff's Securities Act claims will be evaluated pursuant to the notice pleading standard under Rule 8.

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Procedure, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation marks and citations omitted).  This requirement is satisfied when the factual content in the

complaint "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556 (2007)). A complaint that contains only "naked assertions" or "a formulaic recitation of the elements of a cause of action" does not suffice. Twombly, 550 U.S. at 555.

B.              Securities Act Claims

To state a viable Section 11 claim, the plaintiff must allege facts demonstrating plausibly that "(1) she purchased a registered security either directly from the issuer or in the aftermarket following the offering; (2) the defendant[s] participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration 'contained an untrue statement of material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'" In re Morgan Stanley Info. Fund. Sec. Litig., 592 F.3d 347, 358-59 (2d Cir. 2010) (quoting 15 U.S.C. §77k(a)). "In judging whether an alleged omission was material in light of the information already disclosed to investors, [courts of this Circuit] consider whether there is a substantial likelihood that the disclosure of the omitted material would have been viewed by the reasonable investor as having significantly altered the total mix of information already made available." In re ProShares Trust Secs. Litig., 728 F.3d 96, 102 (2d Cir. 2013) (emphasis in original). "It is not sufficient to allege that the investor might have considered the misrepresentation or omission important." Id. In other words, "plaintiffs are not allowed to plead Section 11 claims with the benefit of 20/20 hindsight" because "Section 11 claim[s] cannot be based on a 'backward-looking assessment' of the registration statement." Charter Twp. of Clinton Police & Fire Ret. Sys. v. KKR Fin. Holdings LLC, No. 08 CV 7062, 2010 WL 4642554, at *11 (S.D.N.Y. Nov. 17, 2010) (citation

omitted).

Plaintiff alleges that the Registration Statement filed by MaxPoint violated the

Securities Act because it failed to disclose (1) MaxPoint's reliance on a small number of

customers for the majority of its revenue; and that (2) MaxPoint began signing smaller

customers with smaller budgets in the first half of 2015.

Item 303 of Regulation S-K requires an issuer of securities to "[d]escribe any

known trends or uncertainties that have had or that [it] reasonably expects will have a material

favorable or unfavorable impact on net sales or revenues or income from continuing operations."

17 C.R.F. 229.303(a)(3)(ii).  Knowledge of a trend is an essential element in triggering the

disclosure obligation pursuant to Item 303.  Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc.,

No 07 CV 10528, 2010 WL 148617, at *9 (S.D.N.Y. Jan. 14, 2010).

Here, Plaintiff claims that MaxPoint should have disclosed, at the time of the

IPO, the "trend" that it was signing much smaller companies with smaller advertising budgets.

The Registration Statement at issue was filed on or about March 6, 2015.  According to the FAC,

MaxPoint reported its 1Q2015 financial results after the close of trading on May 13, 2015,

covering the period January 1, 2015, to March 31, 2015, and disclosed at that time that its

trailing twelve month average of revenues for customers had "increased at low-single-digit rate

year-over-year in the first quarter," and that MaxPoint was "experiencing faster growth in the

number of new customers [it was] on-boarding with initial spend levels below the average."  (Id.

¶ 53.)  Plaintiff contends that MaxPoint should have known about the "trend" of signing smaller

customers with smaller budgets at the time of the IPO, since two months of 1Q2015 had elapsed

by the time of the IPO.

A company, however, has no general "obligation to disclose the results of a

quarter in progress."  Afra v. Mecox Lane Ltd., No. 10 CV 9053, 2012 WL 697155, at *12

(S.D.N.Y. Mar. 5, 2012), aff'd, 504 F. App'x 14 (2d Cir. 2012); In re Focus Media Ltd. Litig.,

701 F. Supp. 2d 534, 539 (S.D.N.Y. 2010) (rejecting effort "to hold Defendants liable for [their]

failure to disclose financial information about the third quarter before that quarter had

concluded.")  Furthermore, events occurring within a two month period of time do not establish

a "trend" for purposes of the discloses required by Item 303.  See Blackmoss, 2010 WL 148617,

at *9 ("As a matter of law, a two month period of time does not establish a 'trend' for purposes

of the disclosures required by Item 303."); In re Turkcell Iletism Hizmetler, A.S. Sec. Litig., 202

F. Supp. 2d 8, 13 (S.D.N.Y. 2001) (single quarter decline in operating income need not be

disclosed pursuant to Item 303); Kapps v. Torch Offshore, Inc., 379 F.3d 207, 218 (5th Cir.

2004) (a five-month "decline in natural gas prices [did not yet constitute] a trend" requiring

disclosure); cf. McKenna, 2012 U.S. LEXIS 118312, at *4, 18 (alleged knowledge four months

prior to IPO of uncertainties around continued federal funding affecting product demand should

have been specifically disclosed).

> Plaintiff cites several cases for the proposition that a "trend" for the purposes of

Item 303 disclosure can be inferred from events occurring two months prior to the time of the

disclosure.  However, the cited cases did not involve "trend" disclosures pursuant to Item 303,

but rather material events that would have warranted disclosure alone.  See, e.g., In re Agria

Corp. Sec. Litig., 672 F. Supp. 2d 520, 528 (S.D.N.Y. 2009) (allegation of presentation of

proposed executive compensation package to Board in January 2008 sufficient to support

inference that discussions took place prior to November 2007 IPO); Berson v. Applied Signal

Tech., Inc., 527 F.3d 982, 988 (9th Cir. 2008) (disclosure of a stop-work order two weeks after

an allegedly misleading statement supports inference that contract was known at time of

statement); <u>Friedberg v. Discreet Logic, Inc.</u>, 959 F. Supp. 42, 50-51 (D. Mass. 1997) (introduction of new products that would affect sales about two months after secondary public offering supports inference of prior knowledge).

Plaintiff also claims that MaxPoint did sufficiently not disclose the extent of its reliance on a small number of customers. Specifically, Plaintiff complains that, at the time of its IPO, MaxPoint should have disclosed that it was "heavily reliant upon a small number of customers - just 10% - for the lion's share of its revenues" <u>and</u> that "a full two-thirds of the Company's reported revenues had derived from only 50 of its most lucrative customers." (Pl. Opp. at 22 (citing FAC ¶¶ 4, 32-34, 42, 46-49.))

In fact, MaxPoint did disclose, in two places in the Registration Statement, that it has "historically relied, an expect to continue to rely, on a small number of customers for a substantial majority of our revenue, and the loss of any of these customers may significantly harm our business, results of operations and financial conditions." (Reg. St. at 6, 13.) More specifically, it also disclosed that "[f]or the years ended December 31, 2012, 2013 and 2014, our top ten customers accounted for approximately 32%, 36% and 30% of our revenue, respectively" and that "[w]e expect that we will continue to depend upon a relatively small number of customers for a substantial majority of our revenue for the foreseeable future while we continue to broaden our customer base." (<u>Id.</u> at 13.) The Registration Statement included a chart showing the percentage of total revenue derived from MaxPoint's top 25 customers, for the years 2011 to 2014, disclosing that the top 25 customers accounted for 49 percent of revenues in 2014. (Reg. St. at 54.)

As explained above, in order for an omission to be material in light of information already disclosed, the Court must consider "whether there is a <u>substantial</u> likelihood that the

disclosure of the omitted material would have been viewed by the reasonable investor as having

significantly altered the total mix of information already made available." In re ProShares Trust

Secs. Litig., 728 F.3d at 102 (emphasis in original). "It is not sufficient to allege that the

investor might have considered the misrepresentation or omission important." Id. Here,

MaxPoint disclosed that it was substantially reliant on a small number of customers and more

specifically that its top 25 customers accounted for nearly 50 percent of its revenue in the several

years prior to the IPO. These disclosures put investors on clear notice of the composition of

MaxPoint's customer base and its reliance on a small number of customers for a majority of its

revenue. Since simple arithmetic computation based on the information disclosed would have

revealed that the remaining 51 percent of MaxPoint's revenues were derived from the other 95

percent of its customers and slightly more complex calculations would have enabled an investor

to make more refined analyses of concentrations within that customer base, it is not substantially

likely that further specific disclosure of the fact that the next top 25 customers accounted for

approximately 17 percent of revenue (such that the top 50 customers accounted for two-thirds of

MaxPoint's revenue) would have significantly altered the total mix of information already made

available to investors. The omitted computation therefore was not material under the

circumstances as a matter of law, and cannot form the basis of Section 11 liability.

For substantially the same reasons, the Registration Statement's affirmative

disclosures regarding customers and revenue were not rendered misleading by the omission of

the "trend" and customer concentration information of which Plaintiff complains. Nor did the

omissions violate Item 503 of Regulation S-K, which requires disclosure of "the most significant

factors that make the offering speculative or risky." Accordingly, the Section 11 claims are

dismissed as against all Defendants.

In light of the dismissal of the Section 11 claims against all Defendants,

Plaintiff's Section 12 and Section 15 claims, which rely on the same underlying factual

allegations, must also be dismissed.  See In re Lone Pine Res., Inc., No 12 CV 4839, 2014 WL

1259653, at *6 (S.D.N.Y. Mar. 27, 2014) ("A plaintiff who fails to plead a § 11 claim

necessarily fails to plead a § 12(a)(2) claim as well."); Scott v. Gen. Motors Co., 46 F. Supp. 3d

397, 398 (S.D.N.Y. 2014), aff'd, 605 F. App'x 52 (2d Cir. 2015) (imposing control person

liability under Section 15 requires an underlying Section 11 or Section 12 violation by the

controlled person).

## CONCLUSION

For the foregoing reasons, MaxPoint and the Individual Defendants' motion to

dismiss the First Amended Complaint is granted.  The Underwriter Defendants' motion to

dismiss the First Amended Complaint is also granted.  Plaintiff's request for leave to replead is

denied as futile.  The Clerk of Court is respectfully directed to enter dismissing the First

Amended Complaint and close the case.  This Memorandum Opinion and Order resolves docket

entry numbers 57 and 58.

SO ORDERED.

Dated: New York, New York
         February 13, 2017

                                             /s/ Laura Taylor Swain
                                            LAURA TAYLOR SWAIN
                                            United States District Judge